**ROBINSON & COLE LLP**
Rachel Jaffe Mauceri, Esquire
1650 Market Street, Suite 3030
Philadelphia, PA 19103
Telephone: (215) 398-0556
Facsimile: (215) 827-5982
rmauceri@rc.com

*Counsel for Waters & Kraus LLP (d/b/a Waters Kraus & Paul, LLP)*

**ROBINSON & COLE LLP**
Natalie D. Ramsey, Esquire
1201 North Market Street, Suite 1406
Wilmington, DE 19801
Telephone: (302) 516-1700
Facsimile: (302) 516-1699
nramsey@rc.com

*Counsel for Waters & Kraus LLP (d/b/a Waters Kraus & Paul, LLP)*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>RITE AID CORPORATION, *et al*.[1]<br><br>   Debtors. | Chapter 11<br><br>Case No. 23-18993 (MBK)<br><br>(Jointly Administered) |
| WATERS & KRAUS, LLP (d/b/a WATERS KRAUS & PAUL, LLP),<br><br>   Plaintiff,<br><br>v.<br><br>RITE AID CORPORATION, *et al*.,<br><br>   Defendants. | Adv. Pro. No. 24-_____ |

## ADVERSARY COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT PURSUANT TO 11 U.S.C. § 1141(d)(6)

Plaintiff Waters & Kraus, LLP (d/b/a Waters, Kraus & Paul, LLP, and referred to herein

as "WKP" or "Plaintiff") brings this Complaint against each of Rite Aid Corporation (case number

---

[1] The last four digits of Debtor Rite Aid Corporation's tax identification number are 4034. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/RiteAid. The location of Debtor Rite Aid Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 1200 Intrepid Avenue, 2nd Floor, Philadelphia, Pennsylvania 19112.

23-18993); Rite Aid Hdqtrs. Corp. (case number 23-18999); and Thrifty Payless, Inc. (case number

23-19114) (collectively, the "Defendants") seeking a declaration that the debt owed by the

Defendants to WKP is excepted from discharge under 11 U.S.C. § 1141(d)(6).  In support of this

Complaint, WKP respectfully states as follows:

## PRELIMINARY STATEMENT

1.      Plaintiff brings this adversary complaint to recover fees and expenses incurred in

by its client, Loyd F. Schmuckley, Jr., in pursuing a *qui tam* complaint against the Defendants

under the Federal False Claims Act and the California False Claims Act.  Mr. Schmuckley, a

California pharmacist, discovered during his employment at several Rite Aid stores a management-

mandated practice of failing to satisfy statutory prescription verification requirements, resulting in

systematic false reporting to regulatory government entities and fraudulently obtained government

reimbursements totaling millions of dollars over a period of years.

2.      The False Claims Act litigation settled on the eve of these bankruptcy cases, and is

anticipated to result in an allowed claim to the State of California.  That settlement, however,

carved out statutorily payable attorney's fees and expenses, the claim for which was assigned by

Mr. Schmuckley to the Plaintiff, and the resolution of which was in the early states as of October

15, 2023, the petition date in the Debtors' cases.  The determination and payment of attorney's

fees, which are mandated under both the False Claims Act and the California False Claims Act

and payable by the Defendants, remain outstanding.

3.      Plaintiff's fees and expenses are not dischargeable pursuant to section 1141(d)(6)

of the Bankruptcy Code, which is self-executing. In an abundance of caution, however, Plaintiff

files this complaint seeking a determination and declaration by this Court that its fees and expenses

incurred in the filing, prosecution and settlement of the False Claims Act litigation and the

protection of Mr. Schmuckley's claims following the bankruptcy, together with all fees incurred

in Plaintiff's efforts to collect those fees (including without limitation filing its claims and bringing

this adversary proceeding in the bankruptcy) are non-dischargeable, and allowed and payable on

the soonest of the effective date of a plan of reorganization in the Debtors' cases, or the entry of a

judgment allowing the relief sought herein.

## JURISIDCTION AND VENUE

4.      This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157(a)

and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (I), and (O).

5.      Venue in the District of New Jersey is proper pursuant to 28 U.S.C. § 1409.

## PARTIES

6.      Plaintiff Waters & Kraus, LLP (d/b/a Waters, Kraus & Paul LLP) is a law firm

organized under Texas law.

7.      Defendant Rite Aid Corporation is a corporation organized under the laws of

Delaware with its principal place of business in Philadelphia, Pennsylvania.

8.      Defendant Rite Aid Hdqtrs. Corp. is a corporation organized under the laws of

Delaware with its principal place of business in Philadelphia, Pennsylvania.  Defendant Rite Aid

Corporation is a 100% shareholder of Defendant Debtor Rite Aid Hdqtrs. Corp.

9.      Defendant Thrifty Payless, Inc. is a corporation organized under the laws of

California with its principal place of business in Philadelphia, Pennsylvania.  Defendant Rite Aid

Corporation is a 100% shareholder of Defendant Thrifty Payless, Inc.

## BACKGROUND

**I.    The FCA Action.**

10.    The debt at issue in this Complaint arises from fees and expenses incurred by Loyd F. Schmuckley Jr. ("Mr. Schmuckley" or "Relator"), in his capacity as Relator in that certain action captioned *United States, et al., ex rel. Loyd F. Schmuckley Jr. v. Rite Aid Corporation, et al.*, Case No. 2:12-CV-1699 (the "FCA Action") filed with the United States District Court for the Eastern District of California.

11.    The FCA Action alleged violations of the Federal False Claims Act (31 U.S.C. § 3729 *et seq.*) and the California False Claims Act (Cal. Gov't Code § 12650 *et seq.*) by the Defendants.

12.    The Federal False Claims Act provides that a person who knowingly presents to the United States a false claim for payment, or who otherwise conspires to defraud the United States by obtaining payment of a false claim, is liable to the government for treble damages in addition to a civil monetary penalty. *See* 31 U.S.C. § 3729. Uniquely, a civil enforcement action under the Federal False Claims Act may be brought either by the United States Attorney General or by a private person on behalf the person and the United States Government. 31 U.S.C. § 3730(b).

13.    As an incentive, private individuals who prosecute meritorious qui tam actions are entitled to a percentage of the proceeds of a judgment or settlement award, in addition to reasonable expenses, attorney's fees, and costs. *See* 31 U.S.C. § 3730(d).

14.    Specifically, in cases where the United State government does not intervene, the party bringing the action, in addition to an amount equal to "not less than 25 percent and not more than 30 percent of the proceeds of the action or settlement" and paid from such proceeds, "shall also receive an amount for reasonable expenses which the court finds to have been necessarily

incurred, plus reasonable attorneys' fees and costs," with all such expenses, fees, and costs awarded against the qui tam defendant. *See* 31 U.S.C. § 3730(d)(2)

15.     Similarly, the California False Claims Act authorizes private parties to sue on behalf of the State of California or a political subdivision in order to recover civil penalties and damages.  Cal. Gov. Code § 12650 et seq.

16.     The California False Claims Act also entitles private individuals to a percentage of the proceeds of a judgment or settlement award.  Section 12652(g)(2) provides that, in an action in which the state or political subdivision proceeds with an action brought by a qui tam plaintiff, such plaintiff shall receive "at least 15 percent but not more than 33 percent of the proceeds of the action or settlement of the claim."  In addition, "[i]f the state, political subdivision, or the qui tam plaintiff prevails in or settles any action under subdivision (c), the qui tam plaintiff shall receive an amount for reasonable expenses that the court finds to have been necessarily incurred, plus reasonable costs and attorney's fees," with all expenses, costs, and fees awarded against the defendant."  Cal. Gov. Code § 12652(g)(8).

17.     Plaintiff acted as counsel to Mr. Schmuckley in the FCA Action, and is the assignee of Mr. Schmuckley's interest in any recovery for attorney's fees incurred in connection therewith. A Statutory Fee Assignment, dated March 15, 2017 and attached as Exhibit B to Addendum to the WKP Proofs of Claim (defined below), "transfers, sets over, and assigns to Counsel . . . any and all interest which [Mr. Schmuckley] has in the potential recovery of statutory or hourly attorney's fees" sought in the FCA Action.  A copy of the Statutory Fee Assignment is attached hereto as Exhibit A, and incorporated by reference and made a part of this Complaint.

18.     On June 26, 2012, Mr. Schmuckley filed the original complaint in the FCA Action (as amended, the "FCA Complaint") as Relator, alleging claims under the Federal False Claims

Act on behalf of the United States and under the California False Claims Act on behalf of the State of California.[2]  An amended complaint was filed on September 28, 2017.  *See* FCA Action ECF No. 79.

19.    The United States of America declined to intervene in the FCA Action.  By proposed order dated May 11, 2017 (FCA Action ECF No. 69), the State of California noticed its partial intervention in the FCA Action.  By order dated June 28, 2017, the District Court authorized the intervention.  The State of California filed its complaint in intervention on September 21, 2017.  *See* FCA Action ECF No. 75.

20.    By motion dated June 12, 2020, the Relator and the State of California moved to further amend their respective complaints.  *See* FCA Action ECF No. 315.  The Court granted that relief by order dated April 7, 2021 (FCA Action ECF No. 400), thus allowing the filing of Relator's Second Amended Complaint (FCA Action ECF No. 315-3), which incorporated the State of California's First Amended Complaint-in-Intervention (FCA Action ECF No. 315-1, the "Complaint-in-Intervention").  *See* FCA Complaint at 2.  The Complaint-in-Intervention was a joint effort of Relator and the State of California.  *Id.*  The FCA Complaint and the Complaint-in-Intervention are attached hereto in their entirety as Exhibits B and C, respectively, and incorporated by reference and made a part of this Complaint.

## II.    Nature of the Claims Alleged in the FCA Complaint and the Complaint-in-Intervention

21.    In the FCA Complaint, Mr. Schmuckley, as Relator, alleged violations by the Defendants of 31 U.S.C. §§ 3729(a)(1)(A), (B) & (G) and Cal. Gov't. Code §§ 12651 (a)(1) & (2).  FCA Action ECF No. 315-3.

---

[2] *Schmuckley, ex rel. v. Rite Aid Corp.*, Case No. 2:12-cv-01699-KJM-JDP, ECF No. 1.  References to the docket in the FCA Action will be to the "FCA Action ECF."

22.     Mr. Schmuckley is a pharmacist who worked at Rite Aid stores from approximately April 2007 to August 2007.  He worked at both the Rite Aid at 680 South State Street, Ukiah, CA 95482 and the Rite Aid at 1730 South Main Street, Willits, CA 95490.  Mr. Schmuckley also worked as a relief pharmacist at Thrifty PayLess Drug Stores in Oregon City and Lake Oswego, Oregon from February 1996 to March 1996 and in November and December of 1997.

23.     Defendant Thrifty Payless, Inc. was listed as "provider" in the Medi-Cal Provider Agreements and/or CMC Agreements for pharmacies doing business as "Rite Aid" in California during the period 2007 to 2014.

24.     Since 2011, Defendant Rite Aid Hdqtrs. Corp. had been identified as the holder of the bank account in Pittsburgh, Pennsylvania, into which the State of California deposited Med-Cal payments for claims submitted by Defendants doing business as Rite Aid in California.

25.     During the period Mr. Schmuckley worked at Rite Aid, he observed a pattern of fraud in which Rite Aid employees, acting under corporate guidance, deliberately misrepresented compliance with several state and federal laws in order to obtain compensation from various government agencies.

26.     Relator began working at Thrifty PayLess shortly after it was acquired by Rite Aid and was in the process of coming under the management of Rite Aid. He observed that as Rite Aid began taking over management responsibilities there was tremendous pressure on pharmacists to fill prescriptions as fast as possible. When Relator worked at Rite Aid in 1997 and was re-hired at Rite Aid 10 years later, he saw that Rite Aid failed to meet its legal obligations to screen drugs according to the patients' medical history, counsel patients, or ensure that Medi-Cal formulary requirements for restricted drugs were met.

27.     Prior to the filing of the FCA Complaint, there had been no public disclosure of the allegations made in the FCA Complaint. If there was any public disclosures of the particular allegations and transactions set forth therein, Relator was the original source of those disclosures because he discovered the violations.

28.     Federal and state healthcare programs, including Medicaid, reimburse Rite Aid and other pharmacies not just for dispensing drugs to customers, but also for providing important professional services to patients that improve health outcomes and thereby reduce overall costs of healthcare. Each billing to a government healthcare program involves both a product component, the prescription drug itself, and a service component, comprised of the pharmacist's monitoring of dosage quality, amounts, potential interactions with other prescriptions and over-the-counter and herbal medications, and the dispensing of advice to patients. The pharmacy bills a government healthcare program for a combination of both the product and the service. If the service component is not provided or is provided in a substandard way, any claim made for that service is a false claim actionable under the Federal False Claims Act and the California False Claims Act.

29.     In particular, the FCA Complaint and the Complaint-in-Intervention alleged that the Defendants submitted false claims and created false records to Medi-Cal in violation of Medi-Cal's formulary restrictions.

**A. Medi-Cal's Formulary Restrictions**

30.     Medi-Cal is California's Medicaid public health insurance program.  Medi-Cal provides free or low-cost medical services for children and adults with limited income (and limited resources for some Medi-Cal programs). Medi-Cal is financed by the state and federal governments in the ratio of approximately 56% for California and 44% for the United States.

31.     Medi-Cal publishes a formulary called the "Contract Drugs List" that lists all of the drugs that Medi-Cal may reimburse.   Formulary restrictions are authorized by 42 U.S.C. § 1396r8(d)(6), which states that, "[a] State may impose limitations, with respect to all such drugs in a therapeutic class, on the minimum or maximum quantities per prescription or on the number of refills, if such limitations are necessary to discourage waste, and may address instances of fraud or abuse by individuals in any manner authorized under this chapter." According to Cal. Code Regs. 22 § 51313.3(b), drugs marked with an "*" on the Medi-Cal contract drug list are called "Code I" drugs, and may not be reimbursed unless the conditions in the Medi-Cal formulary are met. (Cal. Code Regs. 22 § 51313.3(b) states: "Code I drugs on the List of Contract Drugs marked "*", require prior authorization in accordance with Section 51003 [the Treatment Authorization Request regulation] unless used under the conditions specified on the Medi-Cal List of Contract Drugs, and are subject to the prescription documentation requirements of Section 51476(c).").

32.     Some Code I medications, marked with an "*" on the Medi-Cal formulary, have restrictions based on patient age or diagnosis in order for Medi-Cal to reimburse for these medications. For example, Ciprofloxacin HCl tablets 250mg -750 mg may only be reimbursed by Medi-Cal if the prescription is used to treat 1) lower respiratory tract infections in persons aged 50 years and older; 2) osteomyelitis; or 3) pulmonary exacerbation of cystic fibrosis. In another example, Dronabinol capsules are indication-restricted for the treatment of anorexia associated with weight loss in patients with AIDS.

33.     For prescriptions that are marked as "Code I" drugs, California regulations explicitly state that the pharmacist must have documentation of the patient's diagnosis, in order for Medi-Cal to reimburse the prescription. 22 CCR § 51476(c) states:

> Records of providers shall document the meeting of Code I restrictions for medical supplies in the list established by the Department and for drugs listed in the

MediCal List of Contract Drugs as follows: (1) The practitioner who issues a prescription for a Code I supply or drug shall document, in the patient's chart, the patient's diagnostic or clinical condition that fulfills the Code I restriction. (2) The dispenser shall maintain readily retrievable documentation of the patient's diagnostic or clinical condition information that fulfills the Code I restriction. If this Code I diagnostic or clinical condition information is transmitted to the dispenser other than by personal handwritten order from the prescriber, the dispenser shall document the transmittal date and the name of prescriber or the employee or agent who is legally authorized to transmit such information. The documentation shall be personally signed by the dispenser.

34.     According to Medi-Cal regulations, "Code I" drugs require that pharmacists fill out a Treatment Authorization Request ("TAR") unless the prescription meets the exact requirements of the Medi-Cal Formulary. 22 CCR § 51313.3(b) states, "Code 1 drugs on the List of Contract Drugs marked "*", require prior authorization in accordance with Section 51003[the Treatment Authorization Request regulation] unless used under the conditions specified on the Medi-Cal List of Contract Drugs, and are subject to the prescription documentation requirements of Section 51476(c)."

35.     Furthermore, according to Medi-Cal regulations, "Unless prior authorization was obtained, 100% of the ingredient cost and professional fee, if any, paid shall be recovered where the drug dispensed is not in compliance with the Code I restrictions in Medi-Cal regulations." 22 CCR § 51488.1(a)(15).

36.     Compliance with the above Medi-Cal rules is a condition for payment of claims submitted to the State of California under the Medi-Cal program. The Medi-Cal Provider Agreement states in paragraph 2 on page 1 that "[p]rovider agrees to comply with all applicable provisions of Chapters 7 and 8 of the Welfare and Institutions Code (commencing with Sections 14000 and 14200), and any applicable rules or regulations promulgated by DHCS pursuant to these Chapters." On page 8 that agreement states that "[p]rovider agrees that compliance with the provisions of this agreement is a condition precedent to payment to provider."

37.    The electronic point-of-sale systems that Medi-Cal uses to approve payment for prescriptions generates warnings that particular diagnoses are required or that other conditions must be met when a pharmacy attempts to bill for a formulary-restricted drug. If pharmacy technicians routinely override these warnings about restrictions on dispensing of drugs by indicating that the pharmacy has verified the required diagnosis or condition, when in fact it has not, then the entire system for controlling fiscal costs of expensive drugs is thwarted.

**B. The Defendants' Submission of False Claims and Creation of False Records**

38.    The FCA Complaint and the Complaint-in-Intervention alleged that the Defendants knowingly submitted claims for Code I drugs in violation of the above rules and knowingly created false records for use in submitting such claims, having made a calculated decision that the benefits of quickly filling prescriptions in its stores greatly outweighs the risks of being caught in the submission of false claims.

39.    Frequently, Rite Aid received prescriptions for Code I drugs for Medi-Cal patients with no diagnosis indicated. Under 22 CCR § 51476(c) and 22 CCR § 51313.3(b), pharmacists are required to verify that Code I prescriptions submitted to Medicaid have a patient diagnosis that matches the Medi-Cal formulary. If the pharmacist did not have documentation of the patient's diagnosis, then the pharmacist may not submit reimbursement for that medication to Medi-Cal. 22 CCR § 51476(c); 22 CCR § 51313.3(b).

40.    As set forth more fully in the Complaint-in-Intervention, due to the large volume of pharmacy claims, California implemented a computerized claim processing system whereby it would have to substantially rely on pharmacy providers, such as the Defendants, to review, verify and confirm that a Code 1 diagnosis-restricted drug was being dispensed to a Medi-Cal beneficiary who actually has the requisite Code 1 diagnosis or condition at the time of dispensing of the Code

1 drug. In that regard, Medi-Cal's computerized claim processing system implemented an automatic denial for Code 1 diagnosis-restricted drugs intending to prompt the pharmacy provider, such as Defendants, to perform its gatekeeping function: i.e., to review, verify, and confirm whether the Code 1 drug was being dispensed to a Medi-Cal beneficiary who actually had the Code 1 diagnosis or condition at the time of dispensing.

41.    As set forth more fully in the Complaint-in-Intervention, beginning in 2014, California selected a statistically valid random sample comprising of 1,904 of Defendant's Code 1 diagnosis-restricted claims. At the time of the filing of the Complaint-in-Intervention, California had reviewed 344 of Defendant's prescription records out of the randomly selected sample of 1,904 Code 1 diagnosis-restricted claims, and determined based on its review of Defendant's prescription records, that Rite Aid did not perform the requisite Code 1 diagnosis review before dispensing the Code 1 diagnosis-restricted drug to the Medi-Cal beneficiary for a substantial portion of Defendant's 1,904 randomly sampled Code 1 diagnosis-restricted claims. A substantial portion of Defendant's pharmacy prescription records connected to the 344 Code 1 diagnosis-restricted claims lacked any pharmacy-associate notation showing a Code 1 diagnosis review. California submitted that, on its information and belief, a substantial portion of Defendant's prescription records connected to the remainder of Defendant's 1,904 randomly sampled Code 1 diagnosis restricted claims would likewise show zero notation of a pharmacy associate's Code 1 diagnosis review.

42.    Instead of following the documentation requirements of 22 CCR § 51476(c), Rite Aid technicians routinely submitted Code I prescriptions to be reimbursed by Medi-Cal without actually verifying with the physician that the patient had a diagnosis that matched the Code I restriction. By failing to verify that Code I diagnosis restrictions were met, Rite Aid created false

records and submitted false statements to Medi-Cal. Furthermore, according to Medi-Cal regulations, "Unless prior authorization was obtained, 100% of the ingredient cost and professional fee, if any, paid shall be recovered where the drug dispensed is not in compliance with the Code I restrictions in Medi-Cal regulations." 22 CCR § 51488.1(a)(15). Therefore, all claims that Rite Aid submitted that did not comply with Code I restrictions were false claims.

43. As further set forth in the FCA Complaint and the Complaint-in-Intervention, despite (a) Defendants' non-performance of the requisite Code 1 diagnosis review before dispensing of the Code 1 drug, (b) the Medi-Cal beneficiary actually not having the Code 1 drug diagnosis or condition restriction, and/or (c) Defendants' failure to adequately document its compliance with Code 1 regulations, Defendant "knowingly" resubmitted for payment to California hundreds of thousands of originally denied Code 1 diagnosis-restricted claims with the use of override codes, use of which under the circumstances was false or fraudulent.

## III. Settlement of the FCA Action.

44. After five years of investigation and six plus years of litigation, the parties consensually agreed to the resolution of the FCA Action, memorializing the terms in a Settlement Agreement on October 13, 2023 (the "California Settlement Agreement"). The parties to the California Settlement Agreement included the State of California, acting through the California Department of Justice, Office of the Attorney General, Division of Medi-Cal Fraud and Elder Abuse; Mr. Schmuckley, as Relator; and the Defendants.

45. Under the California Settlement Agreement, among other things, the Defendants agreed to pay $60 million ($60,000,000.00) (the "Settlement Amount") to California, pursuant to an installment schedule.

46.     The Defendants made one payment of $2 million ($2,000,000.00) under the California Settlement Agreement prior to filing their chapter 11 petitions on October 15, 2023.

47.     The California Settlement Agreement expressly excluded from the Settlement Amount any of Mr. Schmuckley's and Plaintiff's expenses or attorney's fees and costs, and is "without prejudice" to the right of the Plaintiff "to seek to recover reasonable attorney's fees and costs from [the Defendants]." *California Settlement Agreement* at 4; *see also id.* at 7-8 (reserving Mr. Schmuckley's and WKP's rights with respect to their expenses and attorney's fees and costs under the California False Claims Act and Federal False Claims Act). The California Settlement Agreement also sets forth provisions for to the resolution of Claimant's fee and cost claim, *id.* at 5, as well as reservations in the event of a chapter 11 filing. For the latter, the California Settlement Agreement provides, to the extent a chapter 11 filing preceded a consensual agreement or District Court award with respect to attorney's fees and costs, "[a]ll parties' rights and contentions regarding the amount, priority, and dischargeability of Relator's counsel's fee claim are reserved." *Id.* at 5, 15-16. Relator's counsel's right to contest the jurisdiction of the Bankruptcy Court is also reserved, as are the Defendants' rights to oppose Relator's counsel's efforts to prosecute a fee claim in any forum other than the Bankruptcy Court. *Id.* at 5.

## IV.   The Chapter 11 Cases

48.     The Rite Aid bankruptcy occurred prior to the completion of the fee resolution process contemplated under the California Settlement Agreement.

49.     On October 15, 2023, the Defendants, together with their affiliated debtors and debtors-in-possession, commenced cases under chapter 11 of the Bankruptcy Code by filing petitions with the United States Bankruptcy Court for the District of New Jersey.

50.     On January 12, 2024, WKP filed proofs of claim 7361, 7334, and 7445 (the "WKP Proofs of Claim") against the Defendants, respectively.  The WKP Proofs of Claim assert the nondischargeability of the claims set forth thereon and reserve all rights.

## V.    Calculation of WKP's Fees and Expenses

51.     Claimant has calculated its liquidated fees and costs through approximately the date of this Complaint using a lodestar method pursuant to section 3730(d)(2) of the Federal False Claims Act. WKP asserts that it is owed attorney's fees totaling not less than $3,627,332 (including pre-petition fees totaling not less than $3,468,782) and costs totaling not less than $269,783 (including pre-petition costs totaling not less than $69,873, which costs may increase following further reconciliation, as well as outside counsel fees incurred in these chapter 11 cases totaling approximately $200,000 through the date hereof (a portion of which is estimated for purposes of this Complaint), for a total claim of not less than $3,897,205.

52.     WKP asserts that, pursuant to the California and Federal False Claims Acts and case law interpreting them, it is entitled to recover all of its fees and expenses in these chapter 11 cases, including fees and expenses of bankruptcy counsel, incurred in asserting and preserving the rights of the Relator and in pursuing its statutory fee and expense claim (including any fees and expenses incurred in disputing the dischargeability thereof). To date, such fees and expenses are only partially liquidated, including outside counsel fees incurred in these chapter 11 cases as set forth above, and/or have not yet been incurred.

## NATURE OF RELIEF REQUESTED

53.     The Plaintiff seeks a determination that, pursuant to 11 U.S.C. § 1141(d)(6), the attorney's fees and expenses of WKP incurred by Relator in connection with the filing,

prosecution, and settlement of the FCA Action are not dischargeable in the Debtors' bankruptcy.

The Plaintiff has commenced this adversary proceeding pursuant to Bankruptcy Rules 7001(6).

## FIRST CLAIM FOR RELIEF

### (Nondischargeability Pursuant to 11 U.S.C. § 1141(d)(6)(A), clause 2)

54.     Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1 through 53 above.

55.     Plaintiff asserts that the debt of the Defendants is nondischargeable pursuant to Clause 2 of 11 U.S.C. § 1141(d)(6)(A).

56.     Bankruptcy Code section 1141(d)(6)(A) expressly excepts from discharge debts "owed to a person as the result of an action filed under subchapter III of chapter 37 of title 31 or any similar State statute."

57.     The Bankruptcy Code's definition of "person" includes "individual[s], partnership[s], and corporation[s]." 11 U.S.C. § 101(41).

58.     The Plaintiff is a partnership formed under Texas law and the Relator is an individual.

59.     Under any scenario, the debt of the Defendants is owed to a person.

60.     Subchapter III of chapter 37 of title 31 includes, *inter alia*, claims brought under the Federal False Claims Act.  *See* 31 U.S.C. § 3729 *et seq*.

61.     The California False Claims Act is a state statute similar to the Federal False Claims Act.

62.     The FCA Complaint was filed pursuant to the Federal False Claims Act and the California False Claims Act, each of which provides for the payment by the defendant upon settlement of a qui tam action of a relator's reasonable expenses which the court finds to have been

necessarily incurred, plus reasonable attorneys' fees and costs, with all such expenses, fees, and costs to be awarded against the defendant.  *See* 31 U.S.C. § 3730(d), Cal. Gov't Code § 12652(g)(8).

63.     Thus, the WKP fees and expenses due, owing, and payable pursuant to the Federal False Claims Act and the California False Claims Act expressly qualify as an exception to discharge under 11 U.S.C. § 1141(d)(6)(A), clause 2.

### SECOND CLAIM FOR RELIEF
**(Nondischargeability Pursuant to 11 U.S.C. § 1141(d)(6)(A), clause 1)**

64.     Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1 through 53 above.

65.     Pursuant to the first clause of 11 U.S.C. § 1141(d)(6)(A), "the confirmation of a plan does not discharge a debtor that is a corporation from any debt . . . (A) of a kind specified in paragraph (2)(A) or (2)(B) of section 523(a) that is owed to a domestic governmental unit . . ."

66.     In turn, section 523(a) of the Bankruptcy Code provides, in relevant part, that:

a discharge under section 727, 1141, 1192, 1228(a), 1228(b), or 1328(b)of this title does not discharge an individual debtor from any debt— . . .

(2) for money, property, services, ... or credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . .

67.     To prevail on a claim arising under section 523(a)(2)(A), "courts generally require that a movant prove some variation of the following elements in order to establish fraud of any type under section 523(a)(2)(A): (i) the debtor obtained money, property or services through a material misrepresentation; (ii) the debtor, at the time, knew the representation was false or made with gross recklessness as to its truth; (iii) the debtor intended to deceive the creditor; (iv) the

creditor justifiably relied on the debtor's false representations; and (v) the creditor sustained a loss and damages as a proximate result of the debtor's materially false representations." *In re Natrachvili*, No. 20-10782 (KCF), 2022 WL 17742303, at \*3 (Bankr. D.N.J. Dec. 16, 2022).

**(i) The Defendants obtained money through a material misrepresentation.**

68.     Employees of the Defendants knowingly submitted claims for Code I drugs in violation of Medi-Cal's formulary requirements and knowingly created false records for use in submitting such claims.   This material representation constituted false pretenses, false representations, and/or actual fraud.

69.     As a result of these false pretenses, false representations, and/or actual fraud, Defendants received significant monetary reimbursement from Medi-Cal.

70.     Section 1146(d)(6)(a) clause 1 excepts from discharge all liability arising from the fraud, including attorney's fees and expenses.

**(ii) Second, the Defendants knew at the time that the representation was false or made with gross recklessness as to its truth.**

71.     The Defendants had a statutory obligation to comply with Medi-Cal's formulary requirements.  As one of the largest pharmaceutical operations in the United States, the Defendants were well aware of these obligations.  Despite these obligations, representatives of the Defendants routinely failed to comply. From these facts and circumstances, it can be inferred that the Defendants knew at the time that the representation was false or made with gross recklessness as to its truth.

**(iii) The Defendants intended to deceive Medicaid and Medi-Cal**

72.     By knowingly filing false claims and false reports, the Defendants intended to deceive Medi-Cal into paying funds the Defendants did not earn.

73.    The debt for attorney's fees and costs stems directly from the Defendants' deception of Medi-Cal.  Although the debt for attorney's fees and costs is owed to a different party than the debt for the underlying settlement, *all* debt arising from fraud is excepted from discharge under section 1141(d)(6)(A).

74.    Through the California Settlement Agreement, California and Mr. Schmuckley agreed not to contest dischargeability.  Plaintiff has not released such right and, in fact, the California Settlement Agreement expressly reserves Plaintiff's right to contest dischargeability of the Defendants' claims.  *California Settlement Agreement* at 4.

**(iv) Medi-Cal justifiably relied on the Defendants misrepresentations.**

75.    Under the justifiable reliance standard, a creditor is not required to make an independent investigation into the truth or falsity of every representation.

76.    As set forth in the Complaint-in-Intervention, due to the large volume of claims, California implement a computerized claim processing system that relied on pharmacy providers, such as the Defendants, to review, verify and confirm that a Code 1 diagnosis-restricted drug was being dispensed to a Medi-Cal beneficiary who actually had the requisite Code 1 diagnosis or condition at the time of dispensing of the Code 1 drug.

77.    Medi-Cal's reliance on the Defendants' false pretenses, false representations, and/or actual fraud was justified. The Defendants had a legal obligation to comply with Medi-Cal's formulary requirements. The false pretenses, false representations, and/or actual fraud of the Defendants was part of a well-orchestrated deception and not easily detectable by Medi-Cal.

**(v) Medi-Cal sustained a loss and damages as a proximate result of the Defendants' materially false representations.**

78.     As a result of Rite Aid's false pretenses, false representations, and/or actual fraud in submitting false claims, Medi-Cal reimbursed Rite Aid for claims it did not earn a right to be compensated for.  This resulted in a loss to Medi-Cal, which used its funds to pay Rite Aid reimbursements for false claims.

79.     There is no doubt that the false pretenses, false representations, and/or actual fraud from the Defendants was the proximate cause of the overpayment by Medi-Cal. As such, the fifth element is also satisfied.

80.     Because the fraudulent actions of the Defendants are of the type excepted from discharge pursuant to section 1141(d)(6)(A), clause 1, WKP's fees and expenses should not be subject to discharge in the Debtors' bankruptcy.

## PRAYER FOR RELIEF

**WHEREFORE**, by reason of the foregoing, Plaintiff Waters & Kraus LLP (d/b/a Waters, Kraus & Paul, LLP) respectfully requests that the Court enter a judgment finding that:

(1) the fees and expenses of Plaintiff incurred in connection with the filing, prosecution, and settlement of the Schmuckley Action, as well as the preservation of Mr. Schmuckley's claims in connection with these chapter 11 cases, are not dischargeable pursuant to Bankruptcy Code 1146(d)(6)(A);

(2) the fees and expenses of Plaintiff incurred in connection with its pursuit of a determination of the foregoing during these chapter 11 cases, including the filing, prosecution, and resolution of this adversary complaint, also are not dischargeable pursuant to Bankruptcy Code 1146(d)(6)(A);

(3) each of Rite Aid Corporation (case number 23-18993); Rite Aid Hdqtrs. Corp. (case number 23-18999); and Thrifty Payless, Inc. (case number 23-19114) is jointly and

severally liable to Plaintiff for all amounts set forth herein, plus all attorney's fees and

costs incurred subsequently, relating to the preparation of WKP's fee and cost claim,

the preparation of its proof of claim, and litigation of the instant dischargeability action.

Dated: February 12, 2024
     Philadelphia, Pennsylvania

**ROBINSON & COLE LLP**

By: _/s/ Rachel Jaffe Mauceri_
Rachel Jaffe Mauceri
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 398-0556
Email: rmauceri@rc.com

   *-and-*

Natalie D. Ramsey (*pro hac vice* motion pending)
1201 North Market Street, Suite 1406
Wilmington, DE 19801
Telephone: (302) 516-1700
Facsimile: (302) 516-1699
Email: nramsey@rc.com

*Counsel for Waters & Kraus LLP (d/b/a Waters Kraus & Paul, LLP)*